## No. 24977.

CONNIE AND BILL BRETERNITZ AND JOYCE AND RON TODD
v. THE CITY OF ARVADA, A MUNICIPAL CORPORATION, AND
CITY OF WESTMINSTER, A MUNICIPAL CORPORATION.
(482 P.2d 955)

Decided March 15, 1971. Rehearing denied April 12, 1971.

58

DAVID J. HAHN, for plaintiffs-appellees Breternitz and Todd.

SONHEIM, WHITWORTH & HELM, RICHARD L. WHITWORTH, for defendant-appellant, City of Arvada.

HOLLAND & HART, WARREN L. TOMLINSON, EDWIN S. KAHN, STITT, WITTENBRINK & ROAN, JAMES R. STITT, for intervenor-appellee, City of Westminster.

*En Banc.*

Mr. Justice Day delivered the opinion of the Court.

This is an appeal from an order of the district court adjudging an attempted annexation of territory to the City of Arvada to be void. We reverse and hold the annexation to be valid.

The tract proposed to be annexed consisted of about 1,000 acres. A portion of this consists of developed Far Horizons Subdivision, which from its relative size on maps, comprises about 150 to 200 acres. Another portion consists of a 720-acre undeveloped tract owned by persons named Jones, who had contracted to sell it to Witkin VII, Inc. This latter tract is referred to as the Jones-Witkin tract. Neither Jones nor Witkin VII, Inc. have been parties to this litigation.

Petition for an annexation election was filed under The Municipal Annexation Act of 1965. 1965 Perm. Supp., C.R.S. 1963, 139-21-6(2). It was signed principally by residents of Far Horizons Subdivision, and it was not signed by the Joneses nor Witkin VII, Inc. At the election subsequently held there were 591 votes in favor of annexation and 159 votes against.

I.

Under 1965 Perm. Supp., C.R.S. 1963, 139-21-4(3) a tract comprising 20 acres or more which, together with buildings and improvements thereon, has an assessed value in excess of $200,000 shall not be annexed without the written consent of its owners. There was no evidence of the amount of the assessed value of the Jones-Witkin tract. The trial court held that the $200,000 statutory limitation was unconstitutional; that the statute was severable in this respect; and that the 20-acre limitation was valid. The court ruled that since the owners of the Jones-Witkin tract had not consented and since it contained more than 20 acres, the requirement of the statute had not been met and for this reason the annexation was void.

The court concluded that the $200,000 limitation bore

no reasonable relation to annexation, and that it is arbitrary, unreasonable, oppressive and unjust. The court relied upon *Mountain States Tel. & Tel. Co. v. Animas District*, 152 Colo. 73, 380 P.2d 560 (1963), and *Colorado Interstate Gas Co. v. Sable District*, 152 Colo. 89, 380 P.2d 569 (1963). It further concluded that this denied equal protection of the law by preventing annexation of the wealthy while forcing it upon those who were poor or only moderately well off. *Animas District* was under a statute which provided for an exclusion. It was indicated that the elimination of such tracts would make it impossible to control mosquitoes in the district. It was held that these property exclusions bore no reasonable relation to the benefits to be obtained by the district and, therefore, were unconstitutional. A similar ruling was made in *Sable District* involving a water district in which the statute provided for the exclusion of a tract of 20 acres or more.

On the other hand, in *District 50 Metropolitan Recreation Dist. v. Burnside,* 167 Colo. 425, 448 P.2d 788 (1968), the exclusions of realty used for manufacturing, mining, railroad or industrial purposes of an assessed value in excess of $25,000 or any tract of farm land of 40 acres or more was held *not to* make the Metropolitan Recreation Districts law unconstitutional.

There is such a vast difference between annexation to a city on the one hand, and the formation of water, mosquito and recreation districts on the other hand, that we find none of these three cases controlling or analogous here.

■■ A statute is presumed to be constitutional, and to be declared unconstitutional it must be shown clearly to be so. *Love v. Bell,* 171 Colo. 27, 465 P.2d 118 (1970); and *Morgan County Junior College Dist. v. Jolly,* 168 Colo. 466, 452 P.2d 34 (1969). We well might question the wisdom of the General Assembly in permitting these limitations in annexations, but we must not lose sight of the fact that the members of the Forty-Fifth General

Assembly gave far more thought to the wisdom of this legislation before they adopted it than have we. Without a far better education on the subject than we have received in the briefs filed in this case, we believe the members of the General Assembly were far better qualified to pass upon the wisdom of these exclusions. In other words, a sufficiently convincing showing of arbitrariness, discrimination, denial of equal protection and lack of due process has not been made to us in this case. Absent such a showing we simply are not going to declare this statute unconstitutional because some or all of us in this court might prefer no exclusions or different types of exclusions. The trial court erred in declaring this section of the Act unconstitutional.

## II.

The 1965 annexation Act provides for alternate methods of annexing land. *See Aspen v. Howell,* 170 Colo. 82, 459 P.2d 764 (1969). Under section 139-21-6(1)(d) (iv) of the Act (subsection numbering is that used in 1965 Perm. Supp., C.R.S. 1963) the owners of more than 50% of the area sought to be annexed may petition for annexation, and the municipality may allow annexation without the approval of the electorate. Section 6(2) provides for annexation following an approving election. Section 6(2)(ii) provides that a petition for an *annexation election* addressed to the city council in a county the size of the one in question (Jefferson County) "[s]hall be signed by at least seventy five qualified electors or ten per cent of said electors, whichever is less, who are resident in and who are landowners of the area * * *."

Section 6(2) further provides as follows:

"(d)(i) The petition for annexation election shall comply with the provisions of subsection (1)(d) of this section *except that:*

"(ii) It shall contain an allegation that the signers of the petition are qualified electors resident in and landowners of the area proposed to be annexed, and

" (iii) The petition shall request the annexing municipality to commence proceedings for the holding of an election." (Emphasis added.)

Because subsection (1) (d) (iv) as noted above refers to "[a]n allegation that the signers of the petition comprise the landowners of more than fifty per cent of the territory included in the area proposed to be annexed, exclusive of streets and alleys" the trial court held that the petitioners for the election must own more than 50% of the territory. They did not meet that requirement so the court held the annexation election was illegally called and that the annexation was void.

■ Arvada argues that it is an absurdity to require that the requisite number or percentage of landowner-electors must also own more than 50% of the land in order to succeed in having an annexation election. We agree. If the provision that either 75 electors or 10% thereof, whichever is lesser, can petition for an election in which the majority vote will control, it simply does not make sense to add the additional requirement these same petitioners be owners of more than 50% of the land. Under the trial court's construction, urged by the opponents of the annexation, the election provisions contained in the Act would never be utilized. If the owners of more than 50% of the land desired annexation, it would be a needless procedure, both time consuming and expensive, to petition for annexation election. A mere petition to city council would accomplish the same result without the risk of an adverse vote.

The trial court apparently had difficulty with the use by the legislature of the words "except that" in subsection (d) (i) of section 6(2), and in puzzling over the meaning came to the conclusion that all of the provisions of section (1) (d), with no exceptions, applied with the requisites of section 6(2) added.

■■ In determining whether a particular use of a word or phrase is not clear, the meaning of the language of the entire statute, or the relevant portions thereof,

should be considered. "In construing a statute it is our duty to give consistent, harmonious and sensible effect to all of its parts." *Tobin v. Weed,* 158 Colo. 430, 407 P.2d 350 (1965).

 Webster defines "except" to mean "to take out"; "to take or leave out [something] from a number or a whole"; "to exclude or omit."

 We are of the opinion that the legislature intended that subparagraph 6(1)(d)(iv) requiring signatures of more than 50% of the landowners be excepted, *i.e.,* "taken out" and excluded from consideration when the requisite number of petitioners sought annexation by the election alternative. We are aided in arriving at this conclusion by the expression of legislative intent to be found in 139-21-6(3). It reads as follows:

"(3) Procedures alternative. The procedures set forth in subsections (1) and (2) of this section are alternative to each other * * * except that a petition for annexation election filed pursuant to subsection (2) of this section shall take precedence over an annexation petition involving the same territory and filed pursuant to subsection (1) of this section, provided that such petition for annexation election shall be filed at least ten days prior to the hearing date set for the annexation petition filed pursuant to subsection (1) of this section."

The foregoing section, if it is to be given life and meaning, was intended to provide for a voice in the annexation process to be given to *people* living in the area as opposed to corporate or non-resident owners of larger segments of the land. In fact, the section provides for the electorate to have a veto power over annexation when it commands — as it does — that an election petition take precedence over any petition filed with city council by petitioners who own more than 50% of the land. By giving full force and effect to the section 6(2) alternative, one corporate owner, or two, or half a dozen owners of more than 50% of the land cannot willy-nilly impose

their annexation whims on other resident-electors who own the balance or less than 50% of the territory. The latter may nevertheless petition for an election if 75 or 10 per cent wish to put the matter to a vote. It can be seen that to require them to also own 50% of the land would destroy the entire section and make it meaningless and inoperative.

■ If we were to adopt the ruling of the trial court, an election could never be called for by any owners of the lesser territory whether they numbered 75 people or 50% or 100% of the resident-electors when, as in this case, annexation is sought by the residents. The owners of more than 50% of the land then would be the only ones who could accomplish annexation or frustrate the same. The numerical strength of the resident-electors would be a nullity so long as the owners of more than 50% of the land had the complete control. Courts should not be called upon to require such a result where the legislature has gone to such lengths to set forth detailed proceedings for the exercise of the right to vote. Any other interpretation would convert what appears to be careless draftsmanship into a tool to effectively destroy and annihilate the one section pertaining to voting rights.

■ Accordingly we hold that when a petition for annexation election is filed pursuant to section 6(2) of the Act, the signers, if they comprise the requisite number or percentage and are qualified electors and resident landowners in the territory, need not also comply with section 6(1)(d)(iv).

### III.

■ The owners of the Jones-Witkin tract own all of a half-section. A railroad track passes diagonally through the northeast corner of this half-section. It is apparent that the triangular piece of land lying north and east of the track was physically separated from the larger parcel. It was not included in the area proposed to be annexed. 1965 Perm. Supp., C.R.S. 1963, 139-21-4(2) reads as follows:

"In establishing the boundaries of any territory to be annexed, no land held in identical ownership, whether consisting of one tract or parcel of real estate of [sic] two or more contiguous tracts or parcels of real estate, shall be divided into separate parts or parcels without the written consent of the landowner or landowners thereof, unless such tracts or parcels are separated by a dedicated street, road, or other public way."

The court assumed that this was a right-of-way grant to a railroad by the Congress and therefore it was not a mere easement but a limited fee with right of exclusive use and possession. As a result, the court concluded that the triangular tract was effectively separated by the congressional grant and the annexation did not "separate" the Jones-Witkin tract within the meaning of the statute.

In the absence of an averment to the contrary by the owners of the parcel in question, Jones-Witkin, we conclude that the ruling of the trial court was correct.

### IV.

The trial court was critical of several of the findings of the city council when it resolved that an election should be held. The court found that there was little evidence to support the findings of the council that a community of interest existed between the territory proposed to be annexed and Arvada; that the territory is urban or will be urbanized in the future; and that the territory proposed to be annexed is integrated or is capable of being integrated into the City of Arvada. The court found that there was no evidence to support the finding of the city council that the petition was signed by at least 75 persons who were qualified electors and who were residents in and landowners of the area proposed to be annexed; nor of the finding that the annexation would not result in detachment of territory from any school district and the attachment of the same to another school district; nor of the finding of the city council that no additional terms and conditions would be imposed upon the area proposed to be annexed.

Thus far the only construction of The Municipal Annexation Act of 1965 has been in *Aspen v. Howell, supra.* We therefore think it would be helpful to interested cities and parties for us to comment upon these findings of the court, as well as upon other matters presented. With respect to the matters of community of interest, that the territory is urban or will be urbanized in the near future, and that the territory is integrated or capable of being integrated into the city, Section 3(3)(a) of the Act provides that in the absence of a situation not existing here the fact that the territory has the contiguity with the annexing municipality required by the Act shall be a basis for a finding of compliance. That there was requisite continuity was apparent; and this was not challenged. The court erred, therefore, in its criticism of these findings.

There was testimony that the signers of the petition were registered voters, that each signer stated under oath that he was a landowner, and that an examination of the county records disclosed them all to be landowners. We note that the petition recited that the signers were qualified electors, residents in and landowners of the area proposed to be annexed. We have not found anything in the record to indicate that less than 75 of the signers were not qualified to sign. We regard the finding of the city council as to the qualifications of the signers as proper.

The City and County of Denver is the only city in the state whose boundaries are coexistent with those of the school district. We and the trial court can take judicial notice that the only occasion upon which annexation will cause territory in Colorado to be detached from one school district and attached to another is when territory is annexed by the City and County of Denver. Such being the case, there was no necessity for evidence to support the finding concerning school districts.

Any terms and conditions placed upon the annexation necessarily would have to be placed thereon by the

city council. We therefore indulge in the assumption that it knew what it was doing and, if so, there is no need for evidence that there were no terms and conditions.

## V.

■ The annexation ordinance was approved by the city council on the first reading on September 29, 1969. It was then ordered published, and a hearing thereon was set for October 20, 1969. There was publication. Prior to October 20, 1969, the district court in another action restrained the city council from acting until further order of the court; and, as a consequence, the city council conducted no hearing and took no action on October 20, 1969. By November 3, 1969, the restraining order was vacated. On that date the city council again passed the ordinance on first reading and started the wheels of the annexation election in motion. On November 17, 1969, the council adopted the ordinance on final reading. Five of the seven-member council were replaced between November 3, 1969, and the time of final passage of the ordinance. It was argued that the ordinance was invalid because all action with respect thereto was not taken by the same city councilmen. The trial court overruled this contention, holding that a new council may commence where the preceding one ended. We agree and hold that proceedings duly commenced before a city council may be completed regardless of changes in personnel. A city council is a continuing body. *Rogers v. City of Concord,* 104 N.H. 47, 178 A.2d 509 (1962).

## VI.

The Joneses and Witkin VII, Inc., entered into two agreements with the City of Westminster on May 4, 1969. One was an agreement to annex the Jones-Witkin tract to Westminster and in the other Westminster agreed to furnish water service to the land. On the following day the city council of Arvada accepted the petition for an annexation election.

As indicated in the caption, the action was commenced

by Connie and Bill Breternitz and Joyce and Ron Todd. These were residents and landowners in the Far Horizons subdivision. Westminster petitioned to intervene and was permitted to do so. Arvada argues that intervention is not permitted by the Municipal Annexation Act of 1965. In Section 13 thereof provision is made for an election when two municipalities are attempting to annex the same territory. Westminster did not bring itself within the purview of the provisions of that section. Section 15 of the Act defines those who may seek review of the action of the city council, and a city in Westminster's position is not one of those specified.

The fact that Westminster could not commence this action and that this was not a situation in which an election could be held by reason of conflicting annexation claims raises the question whether intervention by Westminster is permitted under our Rules of Civil Procedure, C.R.C.P. 24(b). In view of our holding that the petition is valid, and that the election was validly held, which disposes of the matter adverse to Westminster, we decline to pass at this time on the question of whether the interest of Westminster was sufficient to allow it to intervene in this action.

The decision of the trial court vacating and setting aside the annexation proceedings is reversed.

MR. JUSTICE GROVES dissenting.

MR. JUSTICE GROVES dissenting:

I respectfully dissent from the portion of the majority opinion contained in Article II thereof.

As stated in the majority opinion, 1965 Perm. Supp., C.R.S. 1963, 139-21-6(1)(d)(iv) provides among other things that the petition shall contain "[a]n allegation that the signers of the petition comprise the landowners of more than fifty percent of the territory included in the area proposed to be annexed, exclusive of streets and

alleys." Section 6(2), providing for an annexation election provides as follows:

"(d) (i) The petition for annexation election shall comply with the provisions of subsection (1) (d) of this section, except that:

"(ii) It shall contain an allegation that the signers of the petition are qualified electors resident in and landowners of the area proposed to be annexed, and

"(iii) The petition shall request the annexing municipality to commence proceedings for the holding of an annexation election."

This is not a case of ambiguous wording or of language susceptible to more than one interpretation, in which events courts determine the legislative intent. *Kirschwing v. O'Donnell,* 120 Colo. 125, 207 P.2d 819 (1949). Rather, here we have an instance of plain, unambiguous language. To construe the term "except that" as Arvada urges amounts to an unwarranted judicial amendment of a legislative act. I grant that the wording of the statute is strange. Furthermore, I will not argue with those who say it is absurd. Two venerable English cases illustrate that it has long been the law that courts do not in such a situation amend legislation when it is apparent that the legislature did not act as it intended, and has given no clue as to how it intended to write the act. In one case is found the following:

"It was contended, for the plaintiff, ... that, adopting, to the full extent, the rule so frequently referred to as the golden rule by which judges are to be guided in the construction of acts of parliament, we ought 'to look at the precise words of the statute, and construe them in their ordinary sense only, if such construction would not lead to any absurdity or manifest injustice; but, if it would, then we ought so to vary and modify the words used, as to avoid that which it certainly could not have been the intention of the legislature should be done.'

\* \* \*

"If the precise words used are plain and unambiguous,

in our judgment, we are bound to construe them in their ordinary sense, even though it do lead, in our view of the case, to an absurdity or manifest injustice. Words may be modified or varied, where their import is doubtful or obscure. But we assume the functions of legislators when we depart from the ordinary meaning of the precise words used, merely because we see , or fancy we see, an absurdity or manifest injustice from an adherence to their literal meaning." Jervis, C.J., in *Abley v. Dale,* 138 Eng. Rep. 519 (C.P. 1851)

Crompton, J., in *Woodward v. Watts,* 118 Eng. Rep. 836 (Q.B. 1853), made similar remarks.

Adverting to more recent and direct authority, I refer to *Montrose v. Niles,* 124 Colo. 535, 238 P.2d 875 (1951), and *Chicago Co. v. Patterson,* 65 Colo. 534, 178 P. 13 (1918). In the first cited case it was said:

"We must construe the statute as we find it, and, where the meaning is clear, we connot amend it by construction to conform to what we might believe to be an improvement. The general accepted meaning of the words used can lead to no other conclusion..."

In *Patterson* it was stated:

"The policy of the law may or may not be a wise one, but it is for the court to construe its language as it finds it. The statute being explicit does not admit of interpretation beyond its express letter, and must be administered as we find it, and as we said in *Clayton v. People,* 53 Colo. 124, 123 Pac. 664, 'it would be an act of judicial legislation to give to it any construction other than the plain meaning which the language indicates.'

"If the law requires to be remedied, that is a question for the legislature."

*See Isaak v. Perry,* 118 Colo. 93, 193 P.2d 269 (1948).

Section 6(3), "Procedures Alternative," quoted in the majority opinion does not in my view justify the amendment which this court is making of the statute. It does not require a legislative statement to see that these are alternative procedures. A legislature properly may in-

corporate by reference in one procedure some of the provisions in another procedure.

Section 6(d) contains ten items, one of which is the requirement of an allegation that the signers of the petition comprise the landowners of more than fifty per cent of the territory. The effect of the majority opinion is to say that the term "except that" means something like "in lieu of" as to this one item, but it still means "except that" with respect to the other nine items.

I would declare the annexation invalid for the reason that the petition was not signed by the owners of the Jones-Witkin tract, which comprises more than two-thirds of the area annexed.